## UNITED STATES

v.

**Airman First Class Raul S. ORTIZ, Jr., FR 465–29–3055, United States Air Force.**

**ACM 23910 (f rev).**

U.S. Air Force Court of Military Review.

Sentence Adjudged 15 March 1983.

Decided 27 Oct. 1987.

Appellate Counsel for the Appellant: Colonel Leo L. Sergi and Major Conrad C. Baldwin, Jr.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Robert E. Ferencik.

Before FORAY, BLOMMERS and MURDOCK, Appellate Military Judges.

## DECISION UPON FURTHER REVIEW

### MURDOCK, Judge:

A military judge, sitting as a general court-martial, found the appellant guilty of willful damage to government property and willful injury of national defense material. Both charges were based on his disconnecting an electrical relay in the landing system of an F–15 air superiority fighter. This case is before us on remand from the Court of Military Appeals. *United States v. Ortiz*, 24 M.J. 164 (C.M.A.1987).

When we initially reviewed the case, we held, in an unpublished opinion, that there was insufficient evidence of an intent to harm national defense, and set aside the charge and specification relating to that offense. Since that time, the Court of Military Appeals has decided *United States v. Johnson*, 24 M.J. 101 (C.M.A.1987) in which they held that an inference of an intent to harm national defense arises when there is proof that an accused intended to perform the underlying act. However, the Court's remand of this case to us conditioned this statement about an inference arising by noting:

> [O]nly an inference is involved; and the necessary intent is lacking unless the factfinder determines not only that the prohibited results were highly foreseeable, but also that the accused, in fact, knew they were almost certain and nonetheless went ahead.

*United States v. Ortiz, supra,* at 167.

The Court of Military Appeals has asked us to apply *Johnson* and *United States v. Stewart*, 19 U.S.C.M.A. 417, 42 C.M.R. 19 (C.M.A.1970), to determine whether there is sufficient evidence that the appellant intended to injure national defense by his act. We will turn first to the effect of *Johnson*.

In the present case, the Court of Military Appeals accepted the military judge's find-

ing that the appellant intended to disturb the anti-skid relay. *Ortiz*, at 169. However, the Court stated "it seems clear that Ortiz did not intend or foresee the infliction of extensive physical damage or the protracted loss of use of the aircraft—like that which had occurred in *Johnson*." *Ortiz*, at 169.

We agree that it is unlikely Ortiz intended or foresaw that his actions would damage the aircraft extensively or cause it to be grounded for a long time. However, in our view, this does not lead to the conclusion that the act was not actionable, nor does it indicate a lack of intent to harm national defense interests.

By stating that "whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys ... (items associated with national defense)," Congress indicated that the gravamen of the offense proscribed by 18 U.S.C. § 2155(a) is the damage such misconduct inflicts on the national defense rather than the specific damage to the national defense material, premises, or utility involved. The extent of the monetary damage or the length of the disablement is, therefore, not critical.

The Court recognizes that when critical weapon systems are rendered useless for even a short time national security has been affected:

> Our nation's safety is measured now in seconds—or even milliseconds. We are convinced that Congress was well aware that weapons which do not work provide no protection. Even worse, they create a false sense of security. Accordingly, we conclude that, when the integrity of a weapon system has been directly affected so that it cannot be immediately utilize[d] for its intended military purpose, it has been "injure[d]" within the meaning of sec. 2155(a).

*Ortiz*, at 169.

Although the above passage was part of an evaluation of whether an act which causes no physical damage to the weapon system, like unplugging a relay, could be the basis for a sabotage charge, it applies equally well to the discussion of the appel-

lant's intent. For certain weapon systems the loss of use need not be protracted to constitute an offense under 18 U.S.C. § 2155(a).

In the present case, testimony indicated that unarmed F-15s can ordinarily be armed and combat ready in about 15 minutes. Instead, it took several technicians, specifically trained in troubleshooting aircraft electrical systems, more than an hour to isolate and correct the problems the appellant had caused by dislodging the relay.

The Court of Military Appeals expressed concern that the lack of evidence that the appellant had received any briefing or instructions "that would have led him to believe that the unavailability of the aircraft for this short period would endanger the national defense in any way" might indicate that the appellant was not aware of the consequences of his actions.

We have been unable to find a requirement for accused saboteurs to have been specifically briefed on the consequences of their acts before they can be successfully prosecuted. It is hard to imagine a member of the armed forces today who would question that removing a first-line weapon from service for any period of time would harm national defense; particularly when that servicemember is stationed at a forward base along our defensive perimeter and the weapon is a fast reaction device like an air superiority fighter.

The appellant was not a stranger to the air defense mission. At the time of trial, he had been on active duty for two and a half years. He attended technical training school for aircraft maintenance, and served as an aircraft maintenance crew chief for about two years on F-4 fighter aircraft and four months on the F-15. He had been assigned to Elmendorf Air Force Base (the site of the offenses and the trial) for a little more than two years by the time of the trial. During this time he launched and recovered many aircraft and worked long and varied hours. Given the circumstances of his location in Alaska and his duty as crew chief on a fast reaction air superiority fighter, we are convinced he knew how

important mission-capable aircraft are to the national defense.

We are also convinced that the appellant knew, because of his training in the weapon system and his knowledge of the mission of the base where he was assigned, that it was foreseeable that his actions were almost certain to ground the airplane and to remove it from use in the national defense until the hidden damage could be found and corrected.

We now turn to our consideration of the case in relation to *United States v. Stewart.* In our view this case is clearly distinguishable from *Stewart.* Like the accused in this case, Stewart was upset about his work conditions. He wanted to avoid being returned for duty in the Mediterranean area so he publicly placed some metal objects in the intake duct of a nearby aircraft. The engine was not running, the accused was in the company of another airman, and within eyesight of a supervisory officer. Further, when he placed the objects in the intake, he called their presence to the attention of his co-worker by asking him whether he thought the officer had seen him do that. In those circumstances, the court held that an intent to commit sabotage could not reasonably be inferred from the evidence.

The present case differs significantly. In *Stewart* the court stated that "had the accused been intent on interfering with the national defense of the United States he would have acted in a more surreptitious manner and not so openly." *Stewart,* 42 C.M.R. at 22. Ortiz operated in just such a surreptitious manner by altering the relay located in a normally closed, internal equipment bay of the aircraft. He performed his act in secret, and did not admit that he had done it. Although he did engage in bravado statements about "grounding the jet" and "screwing up the wires," Ortiz remained silent about just how he had "screwed up the wires" unlike Stewart who had revealed the potentially damaging material before the engines were started. His silence caused the pilot to abandon the airplane the accused had tampered with and select a standby aircraft to complete

the mission. This switching of aircraft was done in the presence of the appellant and with his knowledge, but he did not volunteer any meaningful information about how to correct the deficiency he had caused.

Our review convinces us that the appellant intended to cause the damage he caused, and that he took his action with full knowledge that it was highly foreseeable or almost certain that the aircraft he damaged would be removed from its national defense role while the damage was being corrected. The appellant's actions demonstrate that he had the requisite intent to damage the national defense under 18 U.S.C. § 2155(a). We affirm the findings of guilty of both charges and their specifications.

The trial judge considered the charges multiplicious for sentencing. Since we have affirmed both charges, we need not reduce the sentence to within the maximum allowable for an Article 108, U.C.M.J., 10 U.S.C. § 908, offense. *Ortiz*, at 171. We consider the sentence appropriate. Accordingly the findings of guilty and the sentence are

AFFIRMED.

Senior Judge FORAY and Judge BLOMMERS concur.